This is 21-3187 and we'll hear from the appellant. Good morning, your honors. My name, if you'll please the court, my name is Ira Lipsius. I am counsel for Catholic Charities of Southwest Kansas. I want to thank the court for permitting me to argue via Zoom as I had tested positive for COVID on Friday. My symptoms are fairly minor, but under the rules of the court, I would not allow, I would not be allowed to enter the court this morning. Thank you. This action, and we have to look very clearly, is an action for a death trial. Very simple. A person died. It was a life insurance policy. There are underlying issues as to whether the policy was canceled or not, but this is set up as a death trial. Two things have to be made very clear. This is not a case for bad faith, business practices, wrongful termination, premium refund, and if one looks at the three decisions relied upon by the district courts, Walter, Hershey, and Parkhill, none of them involve a collection of a death. So we have to look at the decisions in other jurisdictions. Now, PHL and Catholic Charities agree that this is a case of first impression in the state of Kansas. So let's look at the cases on point. Let's first look at the issue of the position of a beneficiary, and we have to look at the pleading. The pleading clearly states that Catholic Charities is assuming on this for a death claim as the only causes of action. Each one were entitled to death benefit of $400,000 for each of the policies, and that Catholic Charity was the beneficiary of each of the policies as that term was defined in each of the policies. In the Grove versus Grove decision in Kansas, and I will not give the sites unless the court would like it, but it's all in the briefing except for one case on the site. It says the intended beneficiary claim approves when the person obligated to provide the benefit dies. Now, that is not a claim between the insurance company and the beneficiary, but the court recognizes that until the insured dies, there is no claim for the beneficiary, which is what we have right here. The insured dies, and everybody agrees it was, if we use the determining date of the death of each of these insureds, we are within the statute of limitations. Does he agree or disagree with the idea that a beneficiary can take no greater rights than the contract themselves? In principle, they take, well, the beneficiary, this is a direct beneficiary, which is a part of the contract. Here, this is not a third party beneficiary in the principle sense. The beneficiary here is a part of the contract, but the only right that party has under the contract, Your Honor, is to get the death benefit. They have no other rights under the policy. They're not the owner of the policy, but in general, their rights are determined by the terms of the policy. But I guess you probably did answer my question, but I'm just not 100% sure. Irrespective, just generally speaking, are you agreeing or disagreeing with the idea that a beneficiary can take no greater rights? Well, but the beneficiary here is one of the parties. That's what I'm saying. Yes, the answer is yes. The answer is yes with an asterisk, as I said. Okay, so it really doesn't advance the ball for your argument because you're arguing the Catholic Charities as a party doesn't get a benefit until the party dies. Correct. Thank you. So I'd like to look at, and we're told that, you know, there's no, the law in Kansas is not correct on this issue, and DHL would like to start counting cases in each direction. And I believe if we start counting cases in each direction, it would show that the approval takes place upon the death. But let's look also at the quality or the analysis in each of those decisions. I'll start off with the Third Circuit Court of Appeals in Kusera, which this court has a copy of, and it's seen. And in Kusera, the court is very clear. DHL relies upon the dissent. However, there are numerous decisions for the concept there, not the direct point, but Kusera's direct point here, that we now have a death, we have a statute of limitation for the issue of the problem on the payment of the premium, but the death is what governs that statute of limitation. It's almost exactly the same. So the other case that DHL relied, one of the cases, and this is a very solid case to the position of Catholic Charities. Now, DHL relies upon a case called Sturtevant. And the court should have the cite there. I will refrain from cites unless asked otherwise. Now, Sturtevant is interesting because Sturtevant, and I'll quote the language of Sturtevant, specifically says, we make a distinction between a non-payment of premium and a case where there is a term of the policy that allows the policy to terminate. And it looks at a case called Payne. And unfortunately, when these briefs were written, someone did not put Payne in it. It's a 2019 decision. And the case is Payne versus Ohio National Life Insurance, Michigan Court of Appeals, 2019, Nishap, Lexis 7233, or 2019, Westlaw 6173674. Now, Sturtevant cites Payne, and it says that in distinguishing Payne, it says here, citing Payne, the plaintiff claimed that the contraction required prerequisites determination of the policy did not occur, which is exactly what our case is. And it said, if it was not a policy provision, but that the contraction required prerequisites did not occur, it would have basically found in favor of the statute of limitations being the fate of them. So I look at Sturtevant as being supportive of our position, not against our position. And it cites Payne, which is directly on point. Looking at other decisions... Before you go out on counsel with other decisions, how much was paid in premiums on this policy? I believe that it was something over $300,000. You're understated. Yes, say that one more time. I believe, and I could check it out, and when I come for my time that I left, I'll check out the exact amount, but I believe it's somewhere over $300,000 for each of the policies, or very close to that $400,000. Did they pay in premiums that amount? Yes. Over $300,000 for each policy? Correct. Just so the court knows, these were policies bought on priests, and nuns, and other employees of the church. There was 50 or 60 policies, and in fact, as of today, as many of these people are alive, they've paid 130% of the debt. So that's the loss of this life insurance program. But in this matter, there was a notice given to pay a premium of a set sum, and that premium was not paid within the time specified. On this particular, these particular incidents, or these particular insurers, how much was paid in premium? I will check the amount, but I believe it is in excess of $300,000 on each one of those policies, and total premium paid- But on each of those policies, there are many, many insurers, right? No, no, no. Each one is an individual policy for each insurer. So we have an individual, we have an individual policy for each insurer. Each policy was taken out in the amount of $400,000 for many, many priests, and nuns, and other employees of the church. So I think, just to be clear for Judge Murphy, I think what you're trying to tell us is that these policies are, a lot of them are basically underwater. You've paid more premiums than the death benefit. Correct. But I do not believe at the time they lapsed, they had paid more premium than the death benefit, but they have paid, or most of the others as of now, they have paid more than death benefit. Right. Let me, let me ask you a question before you, before you move on. Say that in 1971, my dad bought a life insurance policy, and paid the premiums for four or five years, and he decided that the insurance company was, was demanding premiums that were higher than required by the contract. And he sends them a note or a letter and says, listen, I'm here ready to continue to pay my premiums, but what you're asking for is in excess of the contract. So I would, I'm willing to pay what the contract says, no more. And what you're asking for is more. So I'm not sending you a check until you agree, you know, on the, on the right price, but I am willing to, to comply with the contract. And then he does nothing else. The insurance company internally cancels the policy and he passes in 2021, at which time I, I submit the claim to the insurance company. Where am I? Theoretically, if you were the beneficiary under the policy, the way the cases work, that, uh, the pain, the, the, uh, come after, uh, all these decisions other than the Draper case, uh, you, that is when this becomes right. Now, obviously the more years that pass, the more offensive it will be. Right. And that's why, that's why I bring it up because it seems to me at some level, the owner of the policy has to challenge, challenge the insurance company when they know there's an issue, because in my hypothetical, how can you ever challenge a dispute dating back to 1971, which would be 50 years old at this point, where one of the people in the dispute is dead and probably the company's changed hands several times, and there may not even be any documentation of it. Well, that also goes to any other issue that goes into the original contract, uh, insurance companies taking position and, uh, counsel for BHL has taken this position, a number of actions where if there was something false in the application that was fraudulent and that application was filled out 30 years ago, they could still challenge that even though everybody's dead. So it works both ways in what happens in the industry. But in answer to your question, it's a very, it's a very good question. I understand the problem and it's something that we are faced, uh, frequently, uh, as they ask, they say in their brief, this is BHL says, well, what they could have brought in action. And they said they could have brought in action for nominal damages. There were no nominal damages that you could have brought in action for. They said you could have brought in action for loss of value of policy. I have no idea if the policy, when this policy lapsed, I had no idea or the, uh, capital charities had no idea whether the family with 10 years would be a loss. Therefore, they have no value to it or even today, there would be values. There would be loss of value because that would be speculative. Well, you, you wouldn't know, in other words, you, you're saying you would have an uncertainty about the damages, but obviously in that hypothetical, what the, the, the one thing that everybody does know is that there is the fact of damage. There's just the uncertainty of how much the damages would be because nobody knows when the, the policy holder would die. Right? With all due respect, just the opposite. There may be no damages and it may be they've made a tremendously profitable decision. So put a decision by letting this last because the man lives long enough. They're going to pay so much more premium than the death benefit would, would act. What about this? Go ahead. Sorry. On some of them, I'm sorry. No, you go ahead. I didn't need to talk over you. On some of the policies, they wish that they would have let it last 10 years ago because they paid since then more than the potential death benefit could ever make. So on many of those policies, this portfolio, uh, we put over that portfolio. I mean, so therefore there is no real damages because we don't know if there's any damages until the person passes away. Uh, and then we see the person passed away the next year or five years from now. Uh, I, I realize my time is up and I just want to say that really when you do the quote unquote counting of decisions, the only decision that really supports their position directly is the Draper decision. Uh, the Gono decision does not address the breach of contract. The humble file does not address those breach of contract. I thank you very, very much for listening to me. Thank you. Uh, we'll hear from the appellate. Good morning, your honors. May it please the court. Jarrett Gaynor for Defendant Appellee, PHL Variable Insurance Company. Um, I would like to, uh, start by just sort of addressing a couple, just Judge Murphy's questions about premiums. There is not a record, uh, so to speak on this case. It was, uh, handled on a 12B6 motion to dismiss. There's no allegations, uh, within the complaint, uh, as to how much a premium had been paid. I would be a little surprised if there was $300,000 in premium paid on these policies, uh, during the time that they were in force. It is of course possible depending on the age of the insureds, uh, if they were in their seventies or eighties when these policies were issued, that certainly, uh, could have happened. Um, but it really is irrelevant to the discussion. What really is relevant to the discussion, and I want to start with where Mr. Lipsius just ended, is this idea that a portfolio holder, a, whether it's Catholic Charities or a for-profit investor, can hold a portfolio of policies, allow them to lapse at some point in time, know that they may have a dispute as to the conditions under which the policies lapsed, wait years, five years, 10 years, 20 years, see which ones of those insureds, once they finally die, would have resulted in a profitable death, and then switching capacities to beneficiary, assert claims, um, that, uh, where all of the facts and circumstances are, you know, seven, eight, 10, 15 years, well past the period of limitations prescribed by statute to bring a claim for a breach of contract. That is the issue we are, we are dealing with, uh, here today. According to the complaint, once, uh, the insurer, uh, PHL issued, uh, canceled, uh, declared a cancellation of the policy, it also issued a, uh, grace notice, right? Allowing that to be cured. According to the face of the complaint, reasonable inferences in favor of the plaintiff, based on the complaint, what happened then? Did PHL then, uh, say, yeah, uh, you have a grace period, but that grace period has elapsed, and so we're adhering to the cancellation? Yes, based on the, on the, the, strictly with, with, with what's in the complaint, a notice was sent requesting premium, uh, a, uh, no premium was sent in response, uh, a, a cancellation notice was thereafter tendered. Um, and the Catholic Charities contends they were excused because the, the breaches, uh, with the demand for premium, with the termination of the policy, um, and there's not a lot of meat about what the breaches were, but whatever those breaches were, they were so material and fundamental, uh, to the contractual bargain between the parties that excused Catholic Charities from tendering performance from any further communication or action. So, uh, Judge Carson, in your hypothetical regarding your, your father, which is essentially the facts of the Kirsch case from the District of Hawaii, it's the exact same set of facts, um, uh, the, uh, Catholic Charities didn't even write a letter back. They didn't write a letter back saying, we disagree with, with how you calculated this. They got a notice, they didn't respond to it, and they're saying they can sit back and wait until the insureds under these policies die. They can take a wait-and-see approach, decide whether it's going to be a profitable venture to then later switch capacities into beneficiary hat, uh, have a brand new statute of limitations start running, and then bring a claim, um, within that, uh, five-year statute of limitations. Um, to Mr. Lipsius's point, beneficiaries under a life insurance, uh, contract are not parties to the contract. A life insurance part, a contract has two parties, the policy owner, which is typically the insured, and the insurance company. It's a bilateral agreement between those two parties. One of the rights of the policy owner is to designate a beneficiary, and in the, um, growth v. growth case, which is the divorce case, uh, out of, of Kansas, uh, that Mr., uh, Lipsius, um, I'm sorry, the Catholic Charities, uh, relies upon, one of the reasons why they found that the, uh, spouse, um, who was, had an entitlement, uh, at the time of her former husband's death to be designated as the beneficiary under a $100,000 life insurance policy. Why her claims didn't accrue until his death is that he could have changed the beneficiaries under his policies. He could have changed it from his ex, uh, ex-wife to her, he could have gotten a policy insuring her, and changed it to his ex-wife. The policy that was in dispute. Because it was executory until he died, right? Correct. And isn't the exact same situation, uh, at play in, uh, Judge Carson's hypothetical, because in his hypothetical, if his father had experienced a material breach on the part of the insurer, his father would be excused from continuing to pay premiums. Material breach, contract 101, would excuse continue, continued performance of the other party. And so, that seems to me a natural explanation for cases like Calendar, where courts have said, well, you have the option of suing, well, you have the option of suing for an anticipatory breach, but because the contract is executory, there is no damage, really, that endures in that case until the, the, uh, policymaker who had, or policyholder who had the obligation to buy life insurance died, or in this case, when the decedent, the policyholder died. Your Honor, there, I think there is a, a distinction between, um, Calendar, for instance, I think if you go back to Calendar, they, uh, part of the premise of the anticipatory repudiation doctrine in the executory contract, it has to do with, uh, what remedies were available to you at law. And in Calendar, what they said is, you know, until the insurer died, you had no remedy available at law. It gave you three options. You could wait, um, um, and treat the contract as if it was still in force, and wait until performance was due, or you had two equitable options. You could go to a chancery court, you could bring a, a court, a claim in equity for, um, a, for, to set aside, um, the purported cancellation. You could bring a claim, again, in equity, to, to receive a declaratory judgment. Kansas law allows, uh, does not have that limitation. Kansas law allows you to bring a contract upon the first breach. And again, the claim here, and if you look through their, their petition, about half the numbered paragraphs, uh, uh, have to do with how PHL's grace notices, how the purported cancellation of the policies allegedly violated the policies, breached the policies, were illegal, uh, uh, contravened, uh, statutorily required, uh, uh, uh, processes. That's what the claim is about. Well, then, then, I mean, maybe, and maybe it's just, uh, uh, allegations that would justify failure to continue to pay premiums, just as, as in that hypothetical, Judge Carson's father, uh, would, would seek excuse, uh, from continuing to pay premiums. But let me ask you a, a, a question. So, so in this situation, what could Catholic charities have sued for? So, you say they could have sued. Sure. They, they, they, for what? Well, uh, in, in effect, uh, Mr. Lipsius's firm has sued many of my clients over the years, and as well as have other, other counsel, uh, sued many, many insurance companies for breach of contract, uh, saying that there, there is a contractual obligation, uh, to provide notice, and the failure to provide notice has caused damages in the form of... Okay, so damages. Yes. So, so, so, so, so he says, well, there, there was no fact of damage because depending on how long the, the, the deceit, you know, the, the, the, uh, policyholders, the original policyholders were to live, there may or may not be any damage. And in those cases, what it usually comes down to is expert testimony about the value of the life insurance policy, of the expected present day value of the, the premiums that would need to be paid, uh, the life expectancy of the insured, uh, and what the value of that policy is. You can also bring a claim, uh, for a declaratory judgment that the policy is in fact in force, that the policy did not terminate, and you see these cases while insureds are alive, and many of the cases that we have cited are cases where a policyholder has brought a claim, uh, complaining that, and not only in the case of there was something wrong with the notice, often it comes up in the, in the, in the context of whether or not a premium was received. So someone pleads the mailbox rule. I put the premium in the mail, you say you didn't receive it, I want to have a declaration that I paid my premium, that your cancellation was wrong, and a declaration that moving forward, I'm entitled, uh, to pay my back premiums on that policy, uh, and have that policy restored, um, uh, into force. Are those mutually exclusive, by the way? You said he could sue for damages, but a declaratory judgment would be an equitable remedy that you couldn't get if there was an adequate remedy in law. So are you saying that he could get one or the other? So, I think you could have an election of remedies, uh, issue there, uh, where, uh, the policyholder would have to decide whether they wanted the, to put the policy back in force, uh, to maintain it going forward, which obviously they're going to have to pay premiums. We've seen these cases litigate all the way through a finding by the court that the lapse, um, was defective, and an order, uh, going back to the, to the owner of the policy saying, you know, you need to pay the premiums for, uh, the intervening period of years, and you've got your policy back. That's a remedy the court, uh, can provide. Policyholder could also elect the remedies and say, I don't want to deal, deal with this company anymore. They breached my contract. I want to get the value for which I contracted, and, you know, here's an expert, expert testimony on how much my policy was worth. Um, let's see. Uh, I would like to just kind of going back to what this court is asked to do. There is no Kansas case law that is on all fours with this case, but there is extensive, uh, case law in Kansas that interprets, uh, the statute of limitations, which is prescribed by statute. And the Kansas, uh, courts have been loath to engraft exceptions and extensions, uh, into those, uh, statute of limitations that are not provided by other courts, uh, that are not provided by the legislature. Uh, the most obvious one is that Kansas doesn't recognize the discovery rule with breach of contract actions because it's not provided for, uh, within the statutes. A lot of the cases that we, you know, we have looked at, uh, and I want to address a couple of the ones that are cited, um, by the, um, uh, appellees. Um, I've already talked about the, uh, the calendar case. Um, the two cases within, um, within Kansas, there's a state court, uh, case, uh, that addresses the, um, it's a Kansas, uh, district court opinion that's an ERISA case, the McFarland case, I believe. Uh, the issue in that case was, yes, McFarland versus UPS case. The issue within that case, uh, was not that the, the district court of Kansas did not decide, um, based on a, uh, when the accrual date, uh, happened, whether it was on notification of the termination of the policy or whether it was on the date of death of the insured. The defendant in that case, uh, which was UPS under an ERISA, an ERISA policy, had argued that the plan's three-year statute of limitations applied, uh, to bar claims. Uh, that was their affirmative defense that they put on of statute of limitations. The court addressed it and said, no, it's the five-year statute of limitations, and then just said because it was within five years of the death, it was timely. They didn't address the issue of whether or not you, the defendant could have argued for an earlier accrual time. And in any case, they ruled on the merits that there was no coverage because the policy had terminated previously and it was, it was on an ERISA bench trial. So I don't see that as instructive authority for our situation. Um, I think the great weight of the authority, the trend of authority over the last 30 years as cases involving more modern insurance policies have been addressed by more and more courts, the great weight of that authority, um, goes across and is in our favor and does not favor these perpetual, um, limitations. I mean, you can imagine a situation where someone is 20 years old, takes out a policy, doesn't really understand it, pays a premium, doesn't pay the next premium when the notice comes due. They get a lapse notice. They go on to live a nice long life. They live another 40, 50, 60, 70, 80 years. At what point does the insurance company get to say, that policy is terminated. We can destroy all our documents relating to it. We're never going to have a claim on that. I assume if it's a term life policy, I assume when the term expires. But if it's a whole life policy or a universal life policy, universal life policies will last until age 115. All right. These are questions, and it comes up in a lot of these cases where they note that insurance companies have a seven-year retention policy or the insurance company didn't have records going this far back because it was 30 years ago. These are the reasons you have statute of limitations because it's not a substantive law. It's a expression of public policy for judicial efficiency. They are somewhat arbitrary, and they put bright lines when a cause of action has to be brought. And in this case, if there was a cause of action relating to those lapses in 2013 and 2014, Kansas law dictates they needed to be brought within five years of the accrual of that cause of action, and there's no question Catholic charities could have brought those claims within that time period. I thank the court for your time. Are there any further questions, Your Honors? Okay. No. Okay. Thank you. Thank you, Your Honor. Your Honor, may I be excused? You may. All right. Thank you, counsel. This matter will be submitted. Thank you. And by the way, to Appellant's counsel, thank you. I know that you're sick and still were able to or willing to do this today by Zoom, so I appreciate your willingness to do it by Zoom as well. Your Honor, I just want to make one comment. I'm not arguing. In page three of the judge's decision, it lists the quarterly premium for each of those policies. So it answers the question. The judge's decision on page three specifically answers that question. It was $23,000 a quarter for one policy and $39,000 a quarter for the other. So it's about $160,000 a year and approximately $100,000 a year for each of those policies. Okay. Well, we appreciate you sticking that in even though you're out of time. So anyway, this matter is submitted. Thank you very much.